**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**TOPTAL, LLC, a Delaware Limited Liability**
**Company,**

      **Plaintiff,**

**v.**                             **CASE NO.:** _____

**BREANDEN BENESCHOTT, an individual,**

      **Defendant.**

_____/

## COMPLAINT FOR DAMAGES

Plaintiff TOPTAL, LLC ("Plaintiff" or "Toptal"), by and through its undersigned counsel, files this Complaint against Breanden Beneschott ("Beneschott" or "Defendant") to seek redress against Beneschott, who has caused the embezzlement of significant funds from Toptal, engaged in fraud and civil conspiracy against Toptal, breached his fiduciary duty and betrayed the trust, confidence and authority invested in him in his capacity as Toptal's Chief Operating Officer, and breached his agreement to repay with interest money he owes Toptal. Toptal also seeks a declaratory judgment from the Court regarding Beneschott's former employment-at-will status and his lack of any equity interest in Toptal, LLC.

### JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1332, as there is diversity between the parties and the amount in controversy exceeds $75,000.

2.     Toptal is a single-member Delaware limited liability company, of which Taso Du Val is the single member.

3.     Toptal's principal address is 2810 N. Church Street #36879, Wilmington,

Delaware.

4.      Toptal is a United States-based global company that curates a proprietary talent network of select, highly-skilled independent contractors and sources and makes available such talent to its clients in the United States and globally.

5.      Taso Du Val is a citizen and resident of New York, New York, and is the Chief Executive Officer of Toptal.

6.      Upon information and belief, Beneschott is a citizen of the State of Florida and a resident of Collier County, Florida.

7.      Venue is appropriate in this Court under 28 U.S.C. 1391(b), as Beneschott resides and is domiciled in Collier County, Florida.

## FACTUAL OVERVIEW

8.      Toptal terminated Beneschott's at-will employment for the reasons discussed herein on November 12, 2018.  Toptal reluctantly reached this decision once it uncovered the way and extent to which Beneschott had caused significant funds to be embezzled from Toptal, had defrauded Toptal by improperly diverting more than $170,000 to his live-in girlfriend, had breached his fiduciary duty and betrayed the trust, confidence and authority invested in him in his capacity as Toptal's Chief Operating Officer, and had been improperly using his company credit card for purely personal expenses, including paying for a Caribbean island vacation with his girlfriend, all as further explained below and herein.

9.      Taso Du Val founded what became Toptal, LLC on July 26, 2010, having multiple clients, registering the Toptal.com website, and signing contracts with several clients, one of whom was Beneschott.  Du Val formed Toptal, LLC on October 29, 2010.  As the Toptal business continued to flourish, in mid-November 2010, Du Val reached out to Beneschott and asked him if

he would be willing to help him out and hired Beneschott on or about November 16, 2010, as Toptal's first employee, to be its Chief Operating Officer ("COO"). Du Val instructed Beneschott to introduce himself to prospective clients as Toptal's COO or something that sounded like it would resonate well with clients.

10. As COO, Beneschott reported directly to Du Val, the CEO of Toptal.

11. Beneschott always was paid as an at will, W-2 employee of Toptal.

12. Over the years, Beneschott became unsatisfied that his deal with Toptal, LLC was that of a mere at-will employee with no equity stake because, with the benefit of hindsight and Toptal's success, he came not to like it, but, as COO, Beneschott understood what the nature of his employment and compensation relationship with Toptal were.

13. In 2016 and 2017, Beneschott brought to Toptal's attention that he was involved in multiple civil and criminal cases in the State of Florida involving him and the mother of his minor daughter, including a contested paternity suit and child custody battle for his minor daughter pending in the Circuit Court in and for Lee County, Florida, styled *Senick v. Beneschott*, Case No. 17-DR-0559.

14. Beneschott expressed concerns to Toptal that the mother of his daughter was trying to position him as a tech company multi-millionaire and was using Beneschott's self-aggrandizing media coverage and social media presence to his disadvantage.

15. Accordingly, Beneschott had his personal attorneys contact Toptal because Beneschott and his attorneys were at pains to counter the mother's portrayal of Beneschott and wanted to substantiate that, notwithstanding his colloquial use of the title "co-founder," he was merely a salaried at-will employee of Toptal with no equity stake in Toptal, LLC.

16. At the request of Beneschott and that of his personal attorney, Toptal's outside law

firm provided a letter to Beneschott's personal attorney, dated September 17, 2018, stating "Mr. Beneschott is an employee of Toptal, LLC, which is a privately-held, single member LLC.  Mr. Beneschott is not a member, shareholder, or owner of the company."

17.    To assist with the preparation of such letter, on August 3, 2018, Beneschott's counsel in his paternity suit and custody battle provided to Defendants excerpts of Beneschott's sworn in-court testimony before the Lee County Circuit Court to substantiate Beneschott's understanding that he had no equity interest in Toptal, LLC.  Beneschott testified as follows:

Q:  What is the structure of the company?  Is it a corporation?

A:  It's a single-member LLC, of which I am not the single member.

Q:  Okay.  And so you're a shareholder?

A:  Technically no.

…

Q:  Who is the single member?

A:  Taso Du Val.

…

Q:  At this moment, you don't actually own 17 percent of this company, it's owned by one person?

A: That's correct.

Q: Who's not you?

A: Correct.

(Testimony of Breanden Beneschott given before the Lee County Circuit Court in the case styled *Senick v. Beneschott*, Case No. 17-DR-0559).

18.     Beneschott understood and indeed testified, as noted above, under oath, in the same hearing before the Lee County Circuit Court that he had no equity stake in Toptal, LLC and that he might be entitled at some point in the future to an equity interest but that was in fact contingent and conditional upon his continued employment at the time of a possible future conversion of Toptal, LLC to a C corporation.  As he testified in open court, under oath, Beneschott understood he would get nothing except "upon a conversion, which may or may not happen."  (Testimony of Breaden Beneschott given before the Lee County Circuit Court in the case styled *Senick v. Beneschott*, Case No. 17-DR-0559).

19.     From January 2017 through October 2018, Toptal agreed to advance Beneschott certain monies for legal and other personal expenses related to the various civil and criminal cases involving Beneschott and the mother of his minor daughter, including a contentious paternity suit and custody battle.

20.     Beneschott verbally agreed with Toptal that he would repay the amounts advanced to him, or paid by Toptal directly on his behalf, as a loan with interest at the minimum IRS rate. Toptal was led to believe this amount would be no more than about $70,000.

21.     Much to the company's surprise, by summer 2018, the amounts that Beneschott had the Company pay on his behalf (by ordering his subordinates to pay invoices that he presented for payment) exceeded $400,000, and, ultimately, totaled at least $424,819.60.

22.     In view of the size of this amount, Toptal indicated a promissory note must be entered into and Beneschott and Toptal's representatives began to perform a review of invoices and expenses to finalize a principal amount for a promissory note.

23.     Nevertheless, as Beneschott became more embroiled with the paternity suit and custody battle over his minor daughter, he resisted the formalization of a loan document for reasons

he indicated were related to maintaining himself in an advantageous litigation position with regard to the paternity suit and child custody battle.

24.     Accordingly, Beneschott resisted further moves toward finalizing a promissory note to repay the amounts advanced to him and on his behalf.

25.     At all times, however, Beneschott understood and acknowledged that these were amounts that were loans that needed to be repaid to Toptal. He testified in court in the case styled *Senick v. Beneschott*, Case No. 17-DR-0559, in Circuit Court in Lee County, Florida, as follows:

Q:  Is there a promissory note? Anything in writing indicating you owe the money?

A:  There's not a promissory note.  Determined it wasn't necessarily needed given that deep in audits and everything else that this is very clearly right there. …

Q:  And so how is this different than continuing to take draws from your income that you don't want to pay taxes on? …

A:  I have to pay all this back.

26.     In 2017, Beneschott convinced Toptal that he should secure the services of an executive assistant to assist him with administrative needs.

27.     Beneschott furtively retained the services of his interior designer girlfriend, Danielle Glickson, purportedly to serve as his executive assistant, characterizing the arrangement as one in which he claimed he would be securing executive assistant services intermittently on a contract basis.

28.     Beneschott presented invoices prepared by Glickson on the stationery of her interior design firm, LVD Spaces, and directed individuals reporting to him to have those invoices paid. Beneschott knew that Du Val knew that Glickson was Beneschott's girlfriend but deceptively kept

hidden the fact that his new "executive assistant" was in fact Glickson, his girlfriend, because Du Val, as Toptal's CEO and his supervisor, would have had to approve any such arrangement.

29.     Simultaneously, Beneschott never disclosed to his direct reports (whom Beneschott ordered to pay the invoices from LVD Spaces) that the "services" being "rendered" to Beneschott were being provided by his girlfriend.

30.     Beneschott used the invoicing from his girlfriend's interior design company, LVD Spaces, as a way to hide and disguise the fact that it was his live-in girlfriend whom Beneschott was having Toptal pay.

31.     Beneschott's "executive assistant" was never given a company e-mail address or a Slack account, and her name was kept off the list of the Company's employees and contract workers, further underscoring the sham nature of the arrangement and also indicating the extreme lengths to which Beneschott would go to conceal the fact that he was improperly diverting money to his girlfriend.  Moreover, with no company email or Slack account, and given the virtual, fully distributed nature of Toptal as a remote-only company, Glickson did not interact with members of Toptal's executive team on a professional basis, and indeed could not do so in any way commensurate with her supposed status as the "executive assistant" of Toptal's COO.

32.     This stratagem was part of an elaborate scheme on the part of Beneschott to illegitimately supplement his own income and convert Toptal monies to his own personal use to support his and his girlfriend's lifestyle and standard of living.

33.     In early November 2018, Toptal discovered that Beneschott had been deceptively causing Toptal to pay significant amounts of money to his girlfriend over the preceding eighteen or so months. This discovery came shortly after the start of a new Vice President of People on October 29, 2018, who, as part of her initial review of the Company's personnel configuration,

uncovered the irregular and carefully concealed nature of the payments that Beneschott was furtively directing to his girlfriend.

34.     Beneschott's arrangements involving his girlfriend constituted the proverbial "sweetheart deal," as it resulted in payments to her by Toptal as a purported executive assistant at far-above-market rates for duties for which, as an interior designer, she was unqualified.

35.     By resorting to this elaborate scheme, Beneschott defrauded Toptal into paying his girlfriend a total of at least $170,775.00, excluding purported expense reimbursements, over nineteen months.

36.     At all times, Beneschott knew and understood that what he was doing with respect to having Toptal pay his girlfriend's invoices for "services" supposedly "rendered" to him was wrong, as he himself acknowledged during his termination meeting on November 12, 2018.

37.     Throughout 2017 and 2018, Beneschott misused his Toptal credit card to pay for $17,340.58 of personal expenses and denied or tried to hide that those charges, including a Caribbean vacation trip for himself and his girlfriend, were of a personal nature.

38.     In 2017 and 2018, Beneschott also misused his Toptal credit card to pay $6,915.28 for his girlfriend's airfare to various destinations for no legitimate company purpose.

39.     On or about November 5, 2018, in connection with Toptal's attempt to determine the principal amount of the promissory note that would be used to document the amounts advanced to or paid on behalf of Beneschott, as discussed above, Beneschott falsely stated to Toptal that all of the expenses charged to his Toptal credit card were for business, except as otherwise previously disclosed by him to Toptal.

40.     Even then, when given an opportunity to come clean and admit his misappropriation of Toptal's funds, Beneschott continued to hide his misuse of the company's

credit card for his personal gain, for instance, by conveniently not reporting that he had paid for an upcoming Caribbean vacation later that very week for himself and his girlfriend.

41.    In fact, Toptal discovered that Beneschott had used his company credit card on October 18, 2018, to purchase airline tickets to St. Maarten and hotel accommodations for himself and his girlfriend for a trip from Wednesday, November 7 to Sunday, November 11, 2018.

42.    Toptal also discovered that in July 2018, Beneschott had directed subordinates to pay him a $10,000 bonus, intimating that the bonus had been approved by Toptal's CEO, when that in fact was not the case.

43.    Upon Toptal's discovery of Beneschott's abuse of authority and diversion of funds, as described above, Toptal terminated Beneschott's at-will employment with Toptal on Monday, November 12, 2018, immediately following his return from St. Maarten.

44.    During his termination meeting, Beneschott admitted that he was wrong and agreed that he "should have told someone" at Toptal that he had been having Toptal pay money to his girlfriend.

45.    The expenses incurred and described in paragraphs 26-44 were incurred without permission from or approval, as they should have been, by Du Val in his capacity as CEO and Beneschott's direct supervisor, and were never ratified, condoned or approved by Du Val after they were incurred.

46.    All told, the amounts (i) advanced by, and directly paid on Beneschott's behalf, by Toptal, (ii) of personal expenses charged by Beneschott on his company credit card, (iii) that Beneschott had Toptal pay his girlfriend, and (iv) of his unapproved "bonus," totaled at least $629,850.46.

47.    On July 3, 2019, Beneschott wired $466,373.67 to Toptal.

48.     This wire payment was made to Toptal out of the blue with no prior indication that it was forthcoming, and Beneschott has never provided an explanation for, or accounting of, the payment.

49.     As noted above, Beneschott had grown dissatisfied that his employment terms with Toptal, LLC were those of an  at-will employee with no equity stake, but he also understood his employment and compensation arrangements as a salaried, at will employee, even if he came not to like them.

50.     In his capacity as Toptal's Chief Operating Officer, Beneschott frequently was involved in the review of the company's financial statements and was aware at all times of the ownership structure of Toptal, LLC.

51.     Over the course of 2017 and 2018, Beneschott attempted to recruit and enlist Toptal employees and others in efforts to marginalize, undermine the authority of, and ultimately oust Du Val as CEO of Toptal.

52.     In whole or large part, Beneschott's contempt toward Du Val appeared to stem from Beneschott's resentment and frustration that he had not negotiated a better deal with Toptal than his role as an at-will employee.  At the same time, Beneschott increasingly became more vocal with colleagues and subordinates, openly stating that he should be the CEO of Toptal and that, in his view the only thing wrong with Toptal was its CEO.

53.     In addition, Beneschott's efforts to remove Du Val as Toptal's CEO were becoming more urgent to the extent that Du Val was the one person at Toptal that could hold Beneschott to account for his extensive pattern of fraud and deception, as noted above.

54.     For instance, Beneschott informed the Company's new Vice President of People, even before she joined Toptal on October 29, 2018, that:  (i) he felt there needed to be a change at

the top at Toptal; (ii) it would, in his opinion, be in the Company's best interests if Du Val left Toptal; (iii) there was a group of executives who agreed with Beneschott and had tried to force the issue at the Company's recent executive offsite meeting in Cancun, Mexico in late April/early May 2018; and (iv) Beneschott hoped and expected that she, as the incoming VP of People, could facilitate the process of removing Du Val from his position as CEO.  Otherwise, Beneschott informed the new VP of People, he would be left with no choice but to leave Toptal.

55.     Beneschott's open animosity and contempt for Toptal's CEO were noted in rambling and disturbing peer performance reviews submitted in October 2018, which revealed more about Beneschott than those he was reviewing, in which he rated the CEO and the other executives who Beneschott perceived were not sufficiently receptive to his mutinous overtures, with scores in multiple categories that Toptal only reserves for people who should be terminated.

56.     As Beneschott became insecure about his role and future with the Company, given his open rebellion and the mutinous behavior he was suborning, he made it known that he would like to have a written employment agreement that would, among other things, provide him certain assurances in the event his employment was terminated.

57.     Beneschott constantly complained – and explained that he felt stressed – because he understood that as an at-will employee the CEO could fire him or he could quit, and he would have nothing to show for his time at Toptal beyond, possibly, two weeks of severance.

58.     In fact, on or about July 12, 2018, Beneschott resigned his position and provided Toptal's CEO with two weeks' notice.  Beneschott was encouraged to rescind his decision and instead take a paid leave of absence to focus on his personal problems.

59.     Accordingly, Beneschott informed Du Val on July 15, 2018, that he would take Toptal up on its offer to take a paid leave of absence and would plan to be away for about five weeks from mid-July to August 2018.

60.     When Beneschott returned to work in August 2018, he engaged in additional discussions regarding obtaining a written employment agreement with Toptal, which led to a meeting in early October 2018 in Naples, Florida, between Beneschott and Du Val.

61.     The meeting in turn led to the preparation of a draft employment agreement to be negotiated between the parties.

62.     Indeed, it was while that employment agreement was being negotiated and the need for the parties to understand the nature and extent of Beneschott's personal expenses so that his promissory note could be finalized that Toptal discovered in early November 2018 that Beneschott had been deceptively causing Toptal to pay significant amounts of money to his girlfriend over the preceding eighteen or so months.

63.     The parties never executed an employment agreement.

64.     After the termination of Beneschott's at-will employment, Beneschott, as part of a way to extract even more money from Toptal and continue to unjustly enrich himself at Toptal's expense, has made baseless and unfounded claims to Toptal that, prior to the formation of Toptal, LLC, he was promised a 17% stake in Toptal, LLC.

65.     Also after the termination of Beneschott's at-will employment, again to extract even more money from Toptal and continue to unjustly enrich himself at Toptal's expense, Beneschott has also made baseless and unfounded claims, that he is entitled to $2 million in severance, the monetary equivalent of a two-month leave of absence, and a $40,000 bonus.

66.     No basis exists for any claim by Beneschott to an interest in Toptal, LLC or to any severance, leave of absence, or bonus. On the contrary, Beneschott's at-will employment was terminated for the reasons herein explained, and Beneschott left Toptal's employ unjustly enriched, and with amounts owed by him to Toptal in the form of unpaid loan amounts, unreimbursed credit card charges of a purely personal nature, and restitution for amounts caused to be embezzled and diverted to his girlfriend and for an unapproved, self-awarded bonus, totaling at least $629,850.46.

## COUNT I:  FRAUD

67.     Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-66 of the Complaint.

68.     Beneschott informed Toptal that he needed an executive assistant, with the intent to have Toptal pay money to his girlfriend for little or no work.

69.     Accordingly, Beneschott contracted with his girlfriend through her interior design company to provide "services" to him as an "executive assistant."

70.     The sham nature of this arrangement was evidenced in part by his failure to have her obtain a company e-mail address or Slack account and taking steps he knew would cause her to be not included on the Company's list of employees and contract workers by presenting the arrangement to his direct reports as one that would require only intermittent services to him and paying her as a vendor under his girlfriend's interior design company so those payments would be disguised and listed as payments to the nondescript vendor, LVD Spaces.

71.     Indeed, Beneschott had his girlfriend submit invoices to him under her interior design company, LVD Spaces, for nondescript "services rendered."

72.     Beneschott in turn would submit those invoices to his direct reports, ordering them to be paid, and took steps to hide the arrangement from his supervisor, Toptal's CEO, and other executive officers, because he knew that they knew that Glickson was his girlfriend and would call into question the size and nature of the payments to his girlfriend.

73.     In particular, Beneschott went to the elaborate steps noted above to hide and disguise the fact that the payments he was ordering to made for the invoices he submitted from LVD Spaces were amounts that would be paid to his girlfriend because he knew that his subordinates in finance and accounts payable would question the appropriateness of the payments and report the arrangement to Du Val.

74.     At the time Beneschott retained the "services" of his girlfriend as a contractor, he did so with an intent to deceive and deprive the company of resources, as he knew his girlfriend, an interior designer, would perform little, if any, work for Toptal, and could not do so without a company e-mail address or Slack account, given the virtual distribution of Toptal as a remote-only company, and would have Toptal pay his girlfriend exorbitant rates well above any conceivable market rate for that role—a true "sweetheart deal."

75.     Beneschott intended Toptal to rely on his false representation regarding Glickson in order to cause Toptal's accounts payable department to pay Glickson for purported work at well above-market rates.

76.     At all times, Beneschott knew and understood that what he was doing with respect to having Toptal pay his girlfriend's invoices for "services" supposedly "rendered" to him was wrong, as he himself acknowledged during his termination meeting on November 12, 2018.

77.     In reliance on the false representations by Beneschott, Toptal paid Glickson, Beneschott's live-in girlfriend, excessive amounts of money for little, if any, work – at least not for Toptal's benefit.

78.     In addition, Beneschott directed his subordinate to pay him a $10,000 bonus, intimating that this had been approved by Toptal's CEO, when that in fact was not the case

79.     Toptal has been damaged and defrauded of a significant amount of money, as described above, by Beneschott's intentionally deceptive and false representations.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)     Enter judgment in favor of Toptal and against Beneschott.

(ii)    Award Toptal restitution.

(iii)   Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)     Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

### COUNT II:  BREACH OF FIDUCIARY DUTY

80.     Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-66 of the Complaint.

81.     Toptal and Beneschott shared a relationship whereby Toptal reposed trust and confidence in Beneschott as its Chief Operating Officer, and Beneschott consented to this relationship, undertook such trust, and assumed a duty to advise, counsel, and/or protect Toptal.

82.     By the actions described above and herein, Beneschott breached his fiduciary duty to Toptal and betrayed the trust, confidence and authority invested in him in his capacity as Toptal's Chief Operating Officer, and caused significant damages to Toptal by:

(i)     improperly diverting company funds for personal use by himself and his girlfriend, and abusing his position of trust, responsibility, and authority in directing his subordinates to pay Glickson's sham invoices for "services rendered" that were submitted as invoices from "LVD Spaces" to conceal the true nature of the payments as payments to his girlfriend and to ensure that her name didn't appear on the list of the Company's employees and contract workers – a list Beneschott knew Du Val consulted and reviewed regularly and where it was sure to be discerned by Du Val;

(ii)    taking advantage of – indeed abusing – Toptal's willingness to pay invoices of a personal nature totaling more than $400,000, directing his subordinates to pay any invoice he submitted to them;

(iii)   when confronted with the need to memorialize in writing the repayment of such large amounts in a promissory note, agreeing and then refusing to do so in order to seek a perceived advantage in his ongoing paternity suit and child custody battle;

(iv)    directing a subordinate to pay him a $10,000 bonus, intimating that that had been approved by the Company's CEO, when in fact that was not true; and

(v)     engaging in a campaign to oust the CEO of Toptal.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)     Enter judgment in favor of Toptal and against Beneschott.

(ii)    Award Toptal restitution.

(iii)    Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)    Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

### COUNT III:  BREACH OF ORAL AGREEMENT

83.    Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-66 of the Complaint.

84.    In 2018, Beneschott verbally agreed to sign a promissory note requiring him to pay back the extensive loan he had taken, and was continuing to take, from Toptal, with the minimum IRS interest rate.

85.    Beneschott would not agree to finalize and sign a promissory note reflecting the specific payments he agreed to make, as he indicated it would be advantageous to him not to have to produce the document in the context of his paternity suit and custody battle with the mother of his minor daughter.

86.    Beneschott has breached his oral agreement to sign a promissory note and to repay the loan with interest.

87.    Toptal acknowledges it has received some money from Beneschott, but with no accounting or explanation from him, it is not clear if that amount is meant to be restitution for the amounts he acknowledged at his termination meeting that he wrongfully caused to be paid to his girlfriend, or the amounts he wrongfully had paid to him as an unapproved bonus, or toward what would have been the principal amount of the promissory note, or reimbursements for the personal use of his company credit card.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)      Enter judgment in favor of Toptal and against Beneschott.

(ii)     Award Toptal restitution.

(iii)    Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)     Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

## COUNT IV:  CIVIL CONSPIRACY

88.    Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-66 of the Complaint.

89.    Beneschott conspired with Glickson to arrange the above-described "sweetheart deal" whereby Glickson, through her interior design firm, LVD Spaces, submitted invoices to Beneschott for nondescript "services rendered."  Beneschott, in turn, abused his position of trust, responsibility, and authority and directed his subordinates to pay Glickson's invoices.  The scheme netted them and deprived Toptal of more than $170,000, in exchange for little, if any, work, at least not for Toptal's benefit.

90.    The result of these acts done in furtherance of the civil conspiracy is that Beneschott defrauded and caused the embezzlement of significant funds from Toptal, and Toptal has been damaged as described herein.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)      Enter judgment in favor of Toptal and against Beneschott.

(ii)     Award Toptal restitution.

(iii)    Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)     Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

## COUNT V:  UNJUST ENRICHMENT

91.    Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-66 of the Complaint.

92.    By means of the intentionally deceptive schemes described above, Beneschott defrauded and improperly extracted from Toptal significant monetary benefits for himself, including:

(i)     low-interest advances and payments of personal invoices for Beneschott's personal expenses and legal fees in amounts that greatly exceeded what Toptal had contemplated;

(ii)    payments for sham "services rendered" to Beneschott's live-in girlfriend, which were of indirect, if not direct, benefit to Beneschott, in helping him support his lifestyle and standard of living; and

(iii)   the payment by Toptal of Beneschott's purely personal expenses such as a Caribbean island vacation with his girlfriend.

93.    Beneschott is and was well aware of all of these benefits, and indeed took calculated steps to conceal his receipt of such benefits from Toptal, as noted above.

94.      At all times, Beneschott knew and understood that what he was doing with respect to having Toptal pay his girlfriend's invoices for "services" supposedly "rendered" to him was wrong, as he himself acknowledged during his termination meeting on November 12, 2018

95.      In addition to the foregoing, Beneschott also schemed and betrayed his position of trust, responsibility and authority to have a $10,000 bonus payment made to himself that was not approved by Du Val.

96.      Beneschott voluntarily accepted and retained the foregoing benefits and compensation.

97.      It would be inequitable for Beneschott to retain the value of such benefits and equity and justice demand that Beneschott be compelled to repay Toptal for the value of such ill-gotten gains.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)      Enter judgment in favor of Toptal and against Beneschott.

(ii)     Award Toptal restitution.

(iii)    Award Toptal prejudgment interest.

(iv)     Award Toptal its costs in bringing this action.

(v)      Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)     Award Toptal such other and further relief as the Court deems just and proper.

## COUNT VI:  PROMISSORY ESTOPPEL

98.      Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-66 of the Complaint.

99.     Beneschott promised to repay the loan and the advances Toptal made to him, with interest.

100.    Beneschott deliberately misrepresented the nature of personal expenses charged to his company credit card in the hope and expectation that he would not thereby have to repay Toptal and could therefore get away with a brazen personal misuse of his company credit card.

101.    Toptal relied on the promises and representations Beneschott made to its detriment and has suffered harm as a result.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)     Enter judgment in favor of Toptal and against Beneschott.

(ii)    Award Toptal restitution.

(iii)   Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)     Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

### COUNT VII:  CONVERSION

102.    Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-66 of the Complaint.

103.    The unauthorized acts of Beneschott described above constituted outright theft of Toptal's money and property.

104.    The deprivation occasioned by the theft is inconsistent with Toptal's ownership interest in the money and property stolen.

105.    Toptal has suffered, and continues to suffer, damages as a direct and proximate result of this theft.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)    Enter judgment in favor of Toptal and against Beneschott.

(ii)    Award Toptal restitution.

(iii)    Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)    Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

## COUNT VIII:  DECLARATORY JUDGMENT

106.    Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-66 of the Complaint.

107.     Beneschott was an at-will employee of Toptal, LLC, with no employment contract and no equity stake in Toptal, LLC.

108.    Beneschott claims he is entitled to the items set forth in paragraphs 64 and 65, above.  Toptal asserts that Beneschott is not entitled to the compensation and benefits set forth in paragraphs 64 and 65.

109.    An actual controversy has arisen and now exists between Toptal and Beneschott concerning their respective rights and obligations.

110.    Toptal seeks a judicial determination of the parties' respective rights and obligations and a declaration that Beneschott is not entitled to any of the items set forth in paragraphs 64 and 65, above.

111.    A judicial determination is necessary and appropriate at this time under the circumstances.

**WHEREFORE**, Toptal respectfully requests the Court:

a.  Enter judgment in favor of Toptal and against Beneschott.

b.  Award Toptal its costs in this action.

c.  Declare that Beneschott is not entitled to any equity stake in Toptal, LLC, nor is he entitled to any additional compensation from Toptal, LLC of any sort.

d.  Award Toptal such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/Peter W. Zinober*
Peter W. Zinober, Esquire
Florida Bar No.:  121750
Lara J. Peppard, Esquire
Florida Bar No. 520055
OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART P.C.
100 North Tampa Street, Suite 3600
Tampa, Florida 33602
Telephone: 813.289.1247
Facsimile: 813.289.6530
Email: peter.zinober@ogletree.com
Email: lara.peppard@ogletree.com
*Attorneys for Defendants Taso Du Val and Toptal, LLC*

39608935.1